## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESTATE OF DEREK A. THOMAS ET AL, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:14-cv-00551 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| FAYETTE COUNTY ET AL, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

In late December, 2013, Derek A. Thomas was arrested and brought to Fayette County Prison ("Prison").[1] Mr. Thomas was screened for suicide risk and other medical conditions by Correctional Officer Joseph Barnes and, later that evening, by Prison Nurse Shannon DeLorenzo. In response to inquiries from Prison personnel, Mr. Thomas self-reported a history of drug addiction, recent drug use, attempted suicide by family members, and a history of mental health treatment for depression, bi-polar disorder, sleep disorder, and anxiety. Prison medical personnel concluded that Mr. Thomas did not pose a suicide risk and did not need to be placed under suicide watch. At that time, Mr. Thomas was also tested for heroin and oxycodone; urine drip tests indicated that neither substance was in Mr. Thomas's system. Mr. Thomas claimed that he had recently used cocaine and was undergoing cocaine withdrawal, but it was the practice of the Prison to not test for cocaine, and to not provide medication to alleviate the symptoms of cocaine withdrawal. Therefore, Mr. Thomas was cleared to be released into the general Prison

---

[1] Although called the "Fayette County Prison," the facility is a county jail. *See Johnson v. Medlock*, 2011 WL 311359, at *6 (W.D. Pa. Jan. 28, 2011).

population.  During Mr. Thomas's time in jail—both before and after the examination by Nurse DeLorenzo—Mr. Thomas continually complained of drug withdrawal symptoms ("dope sickness") and requested medication from the Prison staff.  Pursuant to Prison policy, no medication was provided.

The next day, Sunday, December 22, 2013, Correctional Officer Tammy Popiesh came on duty around 3:30 p.m.  Officer Popiesh and Mr. Thomas recognized each other from a prior incarceration of his, so Mr. Thomas helped Officer Popiesh distribute and re-collect the trays for dinner.  About two hours later, Officer Popiesh took her break and was relieved by another Officer.  When Officer Popiesh returned from her break, she found a tragic scene:  Mr. Thomas was hanging from a bedsheet in his cell.  Mr. Thomas had committed suicide.

Plaintiff, Mr. Thomas's Estate, as administered by Mr. Thomas's mother, Tonya Leigh Thomas, now sues Nurse DeLorenzo, Officer Popiesh, Fayette County (the municipality governing the Prison), PrimeCare Medical, Inc., (the private healthcare corporation which contracted to provide medical care to inmates of Fayette County Prison), and Warden Brian Miller (the Warden of Fayette County Prison).  Plaintiff alleges violations of the Fourteenth Amendment of the United States Constitution, via 42 U.S.C. § 1983, and violations of Pennsylvania Wrongful Death and Survival Act statutes.  *See* ECF No. 33.  Specifically, Plaintiff alleges that Defendants violated Mr. Thomas's constitutional rights by failing to provide medical treatment for Mr. Thomas's alleged medical conditions, and by failing to take sufficient precautions to prevent Mr. Thomas's suicide.  Further, Thomas asserts various claims of municipal liability, failure to train, and failure to supervise against Fayette County, Warden Miller, and PrimeCare Medical.

# I. MOTION TO EXCLUDE EXPERT WITNESS

Before getting to those merits issues, the Court must consider Plaintiff's Motion to Exclude Expert Witnesses. ECF No. 67. Defendants introduced into the record the reports of three experts who, unsurprisingly, offered opinions supporting various Defendants' positions in this case.[2] Though Plaintiff did not depose the Defendants' experts, Plaintiff contests the admissibility and evidentiary usefulness of these expert reports. Plaintiff's Motion puts forth three arguments why the Court should strike these experts reports from the record (or otherwise not consider the reports at this stage of the case).

---

[2] The first report was offered by Dr. Richard Althouse, Ph.D. Dr. Althouse received both an M.S. and a Ph.D. in psychology from Pennsylvania State University and has 37 years of experience as a clinical psychologist in correctional and mental health forensic facilities of the Wisconsin Department of Corrections and the Wisconsin Department of Health and Social Services. Dr. Althouse has also provided training in the standards of correctional mental health care practice and suicide prevention and has co-authored two revisions of the STANDARDS FOR PSYCHOLOGY SERVICES IN JAILS, PRISONS, CORRECTIONAL FACILITIES, AND AGENCIES. Dr. Althouse opined that there were no clinical or medical signs that suggested a need to place Mr. Thomas in the medical unit for Suicide Watch and that Mr. Thomas was not in need of any immediate treatment for his complaint of cocaine withdrawal. Dr. Althouse further opined that a more comprehensive examination of Mr. Thomas's medical records would have produced the same result reached by the initial intake screenings because Mr. Thomas possessed few, if any, subjective indicators that he was inclined to commit suicide. Finally, Dr. Althouse opined that the Prison's intake process was consistent with the National Commission on Correctional Health Care's intake standards for suicide screening and that Nurse DeLorenzo's provision of services—and the decision not to place Mr. Thomas on suicide watch—were reasonable and consistent with PrimeCare Medical's Suicide Prevention Program. *See* ECF No. 73-4.

The second report was offered by Terry S. Fillman. Mr. Fillman is a Registered Nurse and Certified Correctional Health Professional who has worked as a Correctional Nurse and Health Services Administrator for the San Bernardino County Sheriff's Department for 23 years. Mr. Fillman is also a Health Administrator Corrections Inspector for the Institute of Medical Quality, and is a member and educator for numerous national correctional health care associations. Mr. Fillman opined that the medical and custody staff at the Prison provided appropriate and comprehensive health screening for Mr. Thomas within applicable correctional standards. According to Mr. Fillman, the documented actions of the staff at the Prison were consistent with what a reasonable person would have done given the same circumstances. *See* ECF No. 73-4.

The third report was offered by Lawrence J. Guzzardi, M.D. Dr. Guzzardi received an M.D. from Jefferson Medical College, a Masters in Toxicology from the University of Kentucky Medical Center, and a Masters of Business Administration from University of Pennsylvania's Wharton School. In practice, Dr. Guzzardi worked in Emergency Medical Departments at a number of hospitals for 26 years and held academic positions at the University of Kentucky Medical Center, the Hershey Medical Center of the Pennsylvania State University, and the University of Pennsylvania School of Medicine. Dr. Guzzardi is also a member of numerous medical societies and has published and lectured about various correctional medical and toxicological subjects. Dr. Guzzardi opined that the cocaine withdrawal does not require specific medical intervention and that there is no generally recognized detoxification protocol for cocaine. Further, Dr. Guzzardi opined that the medical treatment rendered to Mr. Thomas at the Prison was within acceptable standards. *See* ECF No. 73-6.

First, Plaintiff alleges that the reports were improperly or insufficiently verified.  Plaintiff may have been right initially, but, in the interests of justice, Defendants were provided an opportunity to correct any shortcomings in this regard.  They have done so.  *See* ECF No. 87; ECF No. 88; ECF No. 89.

Second, Plaintiff asserts that the statements of the experts should not be considered because they are contrary to Plaintiff's own assertions and, at the summary judgment stage, Plaintiff's assertions must be favored.  But the statements made by Plaintiff in contradiction of the expert reports are not based upon facts in the evidentiary record.  Instead, these conclusory factual assertions are found only in Plaintiff's pleadings and briefs.  This is not enough to get past a summary judgment motion.  Though factual disputes must be viewed in a light most favorable to the non-moving party, a non-moving party is not automatically entitled to a presumption of correctness on a given factual issue "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's" evidence. *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57 (1986). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[T]he issue of fact must be 'genuine.' When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (internal citations omitted); *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) ("An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."); *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir. 1980) ("[W]hen an issue of fact is supported by affidavits or other evidence which admit of only one conclusion, the court may not draw an opposite conclusion merely on the basis of unsupported allegations.").

Defendants have provided properly supported expert evidence on various issues directly relevant to the case.  Plaintiff cannot exclude this expert evidence simply by asserting that the opposite is true based on their own pleadings and briefs.

Finally, Plaintiff challenges the admissibility of the expert testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  As part of a court's essential "gatekeeping" function to ensure that expert testimony is not only relevant but also reliable, it must make sure that the proffered expert meets three requirements: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("We have interpreted the second requirement to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." (internal quotations omitted)).  *See also* Fed. R. Evid. 702.[3]  Despite Plaintiff's protestations, the experts here provide reliable, relevant, expert opinions that could assist the trier of fact.

Rightly, "Plaintiff does not challenge here the credentials of any Prime expert."  ECF No. 68, at 20.  The experts are surely "qualified."  *See Pineda*, 520 F.3d at 244.  Furthermore, the expert testimony here would assist the trier of fact by providing the fact-finder with information pertinent to observable drug-withdrawal symptoms, suicide correlates, treatment procedures, and the standards of care to be employed by medical professionals in a prison setting.  The expert

---

[3] Rule 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

testimony is just as surely "relevant."[4]  *See Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) ("The third element under Rule 702, namely, whether the expert testimony would assist the trier of fact, 'goes primarily to relevance.'") (quoting *Lauria v. Amtrak*, 145 F.3d 593, 599 (3d Cir. 1998)).

Thus, Plaintiff primarily contests the second prong of the gatekeeping test:  "Plaintiff urges [that] each of Prime's experts are not 'reliable.'" *See* ECF No. 68, at 20.  An inquiry into the reliability of an expert should be "flexible," *Daubert,* 509 U.S. at 594, but the focus should remain "on principles and methodology, not on the conclusions generated by the principles and methodology." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999) *amended*, 199 F.3d 158 (3d Cir. 2000).  *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999) ( "[The objective] is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Though Plaintiff may not agree with the conclusions generated by these experts, each of the three experts considered the record facts of the case in light of their extensive education, training, and experience, in order to render their professional judgments.  Nurse Fillman—a health care operations administrator and experienced Correctional Nurse who writes about, teaches, and implements Standardized Procedures for Registered Nurses—analyzed the documented actions of the Prison medical personnel to determine whether, given Fillman's training and experience, these actions were reasonable and comported with applicable standards of care.  Dr. Guzzardi, M.D.—an expert in toxicology (the study of the adverse effect of

---

[4] While Plaintiff contests this point, Plaintiff's arguments to this end are without merit.  The matters advanced in the report will help the trier of fact to understand the evidence or to determine a fact in issue.  *See* Fed. R. Evid. 702. *See also* Fed. R. Evid. 401("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")

chemicals on living organisms) and a long-time emergency medical physician—offered his expert opinion on the proper detoxification protocol for cocaine and whether the medical treatment provided to Mr. Thomas was reasonable. Finally, Dr. Althouse, Ph.D.—a former psychologist for various correctional institutions, Chair of the Practice Standards Committee for the American Association of Correctional and Forensic Psychology, a consultant for suicide prevention policies for jails and prisons, and an author of two versions of the STANDARDS FOR PSYCHOLOGY SERVICES IN JAILS, PRISONS, CORRECTIONAL FACILITIES, AND AGENCIES—opined on whether the intake procedures were appropriately conducted by Prison staff and whether Mr. Thomas indicated suicidality. Each expert analyzed the documents in the record in light of their respective area of expertise and rendered an opinion, based on this expertise, pertinent to a contested issue in the case. The expert opinions are reliable, and therefore should not be stricken from the record. *See Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) ("Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility.").

Notably, however, the use of expert reports at the summary judgment stage lies at the intersection of two doctrines that appear to be in tension. First is the rule, outlined above, that when a moving party produces record evidence to carry its burden under Rule 56, the nonmoving party cannot simply dispute that evidence in theory; it must present some actual record evidence to contravene the moving party's supported assertion. *See Matsushita*, 475 U.S. at 586. Second is the oft-repeated understanding that "the trier of fact is not bound to accept expert opinion, even if it is uncontradicted." *Minnesota Mining & Mfg. Co. v. Berwick Indus., Inc.*, 532 F.2d 330, 333 (3d Cir. 1976). *See also Drysdale v. Woerth*, 153 F. Supp. 2d 678, 689 (E.D. Pa. 2001) *aff'd*, 53 F. App'x 226 (3d Cir. 2002) ("The fact finder is free to accept or reject expert testimony

as it deems proper, even if such testimony is uncontroverted.").[5] If summary judgment is only appropriate where "no reasonable jury could find in the nonmoving party's favor based on the record as a whole," *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998), but a reasonable juror can appropriately reject uncontroverted expert testimony, then it would seem that a grant of summary judgment could never depend upon the statements or conclusions of an expert.[6]

But does this mean that expert reports are meaningless at the summary judgment stage simply because a jury is free to disbelieve or reject the expert's conclusions? Imagine, for example, the following case: Peter-Plaintiff sues Cola-Company alleging that Cola-Company's soda has caused Peter-Plaintiff's lung cancer. In support of a motion for summary judgment, Cola-Company produces the reports of ten indisputably and highly qualified physicians/scientists who each independently opine (to a reasonable degree of medical or scientific certainty) that Cola-Company's product cannot have caused the lung cancer; Peter-Plaintiff produces no record evidence besides evidence of his consumption of cola and the lung cancer itself. Can (or even must) a court deny Cola-Company's motion for summary judgment because a later trier of fact could disbelieve the uncontradicted expert opinions? Such a rule would appear contrary to the purposes of summary judgment.

Over seventy years ago, in *Sartor v. Arkansas Natural Gas Corporation*, 321 U.S. 620 (1944) the Supreme Court waded into this morass, appearing to support the conclusion that a

---

[5] Of course, a fact-finder is free to disregard, in whole or in part, the testimony of any witness, fact or opinion, lay or expert. However, the contention that the evidence advanced by the moving party may be disbelieved is not enough to avoid summary judgment. *Matsushita*, 475 U.S. at 586.

[6] Of course, the use of an expert by a nonmoving party will not automatically allow that party to avoid summary judgment. *See In re TMI Litigation,* 193 F.3d 613, 716 (3d Cir. 1999) ("A trial court is not precluded from granting summary judgment merely because expert testimony is admitted. If, even given the proffered expert testimony, the proponent still has failed to present sufficient evidence to get to the jury, summary judgment is appropriate.") (internal quotations omitted).

court may not rely solely on expert testimony for purposes of resolving a summary judgment motion. In *Sartor* the core issue was the market price of natural gas at the time that gas was delivered pursuant to a contract. In support of a motion for summary judgment, the defendant submitted the affidavits of several expert witnesses supporting the defendant's claim as to the price of the gas. The Supreme Court held that summary judgment was inappropriate and observed that "it is for the jury to decide whether any, and if any what, weight is to be given to [opinion] testimony . . . the jury, even if such testimony be uncontradicted, may exercise their independent judgment." Because of this, *Sartor* has often been cited for the proposition that a jury may accept or reject opinion evidence as it sees fit, even if the testimony is uncontradicted and unrefuted. *See, e..g*, *Minnesota Mining*, 532 F.2d at 333; *University Marketing & Consulting v. Hartford Life & Accident Ins.*, 413 F. Supp. 1250, 1264 (E.D. Pa. 1976).

However the ruling in *Sartor* is seemingly more nuanced than a blanket rejection of any effect of expert or opinion testimony at the summary judgment stage. The *Sartor* court noted that if the "admissible opinion evidence" could be "given conclusive effect" the Court would have to "sustain the [summary judgment] motion." *Sartor*, 321 U.S. at 625. However, the Court found that certain facts "made it inconclusive"—namely, that every individual who had submitted an affidavit was interested in the resolution of the case in some way. *Id*. at 626 ("Each of them either is an officer of the defendant or is a lessee, or is an employee or officer of a lessee corporation, engaged like defendant in gas production, and each certainly is open to inquiry as to the truth of plaintiffs' attorney's sworn statements that each has interest in or bias as to the subject matter of this litigation."). According to the *Sartor* Court, "the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." *Id.* Thus, *Sartor* may not preclude the

consideration of experts in all summary judgment situations, but rather only those in which the expert is part and parcel of an interested party. *See Thebes v. Pennsylvania*, 2012 WL 1802044, at *6 (M.D. Pa. May 17, 2012) (noting that *Sartor* "held that the grant of summary judgment was inappropriate in light of the fact that the expert witnesses were interested in the outcome of the litigation," and independently holding that a bankruptcy court may rely on "uncontracted expert affidavits and reports.").

Much more recently, the Third Circuit touched on the issue in *United States v. Donovan*, 661 F.3d 174, 188 (3d Cir. 2011). In *Donovan*, the United States submitted two expert reports concluding that the defendant's property affected the integrity of navigable waters, and thus fell under the jurisdiction of the Clean Water Act. The *Donovan* court held that "these reports satisfy the Government's initial burden on summary judgment," and thus the court examined whether the defendant "came forward with specific facts showing that there is a genuine issue for trial." *Id*. at 185–86. The defendant offered no evidence to counter this showing but instead contended that, under *Sartor*, summary judgment was inappropriate because "a reasonable jury would be free to disbelieve the opinions and conclusions of the Government's experts." *Donovan* held that *Sartor* "is not controlling here because the *factual* evidence offered by the Government" (which was contained in the two expert reports) "is enough to meet its burden of production for a Rule 56 motion." *Id.* (citing *Pelphrey v. United States,* 674 F.2d 243, 247 (4th Cir. 1982) and noting that *Pelphrey* "distinguish[ed] *Sartor* as dealing with 'opinion evidence' when the moving party had submitted factual affidavits") (emphasis in original).

*Donovan* appears to draw a distinction between "factual evidence"—even that factual evidence contained in an expert opinion—and expert "opinion evidence" for purposes of what may be considered as conclusive at the summary judgment stage. But even this distinction

doesn't seem applicable to every case, and is a somewhat elusive one in any event, as can be seen from the *Donovan* Opinion itself. Consider the hypothetical above concerning Peter-Plaintiff: must summary judgment be denied if it was the uncontradicted "medical opinion" of the ten qualified experts that Cola-Company's soda simply cannot cause lung cancer? Is that "fact" or "opinion" as to a lack of a causal link? Indeed, numerous district courts have recognized that a summary judgment motion can be properly granted based upon what would appear to be the *opinion* of an expert. *See Stiso v. State Farm Fire & Cas. Co.*, 2015 WL 7296081, at \*9 (D.N.J. Nov. 18, 2015) (collecting cases). *See also Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 361 (D.N.J. 1995) (finding that where plaintiff had no expert "on the issue of whether [plaintiff's] exposure to platinum salts caused his chronic, post-employment asthma" to counter defense experts, he could not "prove causation, and summary judgment . . . must be granted."). In *Sisto* itself, the defendant insurance company produced an expert who "opined" as to the cause of water damage in plaintiff's home; if defendant's expert was correct, the damage would not be covered by the insurance policy. *Id.* at 8. Since the plaintiffs did not offer "any evidence or expert opinion in response to [defendant's expert's] conclusion," the court granted summary judgment in favor of the defendants. *Id.* at 9 ("While Plaintiffs further argue that this Court may not grant summary judgment based on Defendant's expert alone, the Court finds that Plaintiffs have failed to [ ] proffer any expert or evidence to refute Mr. Popolizio's conclusions, and thus, the Court may rely on Defendant's expert in granting summary judgment here."). In support, *Stiso* noted a number of cases in which the proffered testimony of an unopposed expert formed the basis for a successful summary judgment motion.[7]

---

[7] *See, e.g.*, *Luby v. Carnival Cruise Lines, Inc.*, 633 F. Supp. 40, 42 n.3 (S.D. Fla. 1986) (noting that, "[w]here, as here, an issue is one of the kind on which expert testimony must be presented, and the affidavit of the expert is

This Court concludes that, in accord with *Donovan*, opinion testimony may be considered at the summary judgment stage in the following manner. Experts may be used to satisfy (or help satisfy) the "initial burden [ ] on the party seeking summary judgment to point to the evidence which it believes demonstrate[s] the absence of a genuine issue of material fact." *Donovan*, 661 F.3d at 185 (noting that the expert "reports satisfy the Government's initial burden on summary judgment.") (quotations omitted). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "If the moving party carries this initial burden," then the nonmoving party may negate the expert reports by "com[ing] forward with specific facts" (rather than "some metaphysical doubt as to the material facts") that counter the moving party's arguments and show "that there is a *genuine issue for trial*." *Donovan*, 661 F.3d. at 185 (citing *Matsushita*, 475 U.S. at 586–87) (emphasis in original). *See also Deitrick v. Costa,*, 2015 WL 1605700, at *4 (M.D. Pa. Apr. 9, 2015) ("More simply put a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim."). As such, an unopposed, favorable expert report will not automatically win a summary judgment motion for a moving party. However, consistent with *Donovan*, the expert report may allow a moving party to fulfill its initial burden of showing that the nonmoving party has failed to support its claim or failed to introduce a genuine issue of material fact necessitating a trial; such a showing requires the nonmoving party to come forward with specific record evidence to show why a trial is necessary. Presumably this could take the form of an opposing expert opinion, but it could also be fulfilled by other record evidence which

---

uncontradicted, summary judgment is proper"); *Brown v. Kordis*, 46 F. App'x 315, 317 (6th Cir. 2002) (holding that "the district court did not err in granting summary judgment" since the "physical evidence and unrebutted expert testimony" left no genuine issue of material fact); *Evans v. Mentor Corp.*, 2005 WL 1667661, at *3 (E.D. Va. June 28, 2005); (finding that the defendant was entitled to summary judgment because "Plaintiff's speculative evidence [was] countered by [Defendant's] unrebutted expert testimony"); *Sierra Club v. Ga. Power Co.*, 2007 U.S. Dist. LEXIS 100219, at *25 (N.D. Ga. Jan. 11, 2007) (ruling that since the defendant "has presented powerful and uncontradicted expert testimony," the defendant is entitled to summary judgment).

calls into question the basis for, or evidentiary value of, the expert testimony proffered by the moving party.[8]

Having now concluded that Defendants' expert reports should not be stricken from the summary judgment record (and after analyzing what this means at the summary judgment stage), the Court can proceed to consider Defendant's Motion for Summary Judgment.

## II. DELIBERATE INDIFFERENCE TO A MEDICAL NEED

Defendants first contend that "there is no genuine dispute as to any material fact" and that Defendants are "entitled to judgment as a matter of law" on Plaintiff's claims that Defendants were deliberately indifferent to Mr. Thomas's medical needs. *See* Fed. R. Civ. P. 56(a). One of Plaintiff's two constitutional claims is that Defendants violated Mr. Thomas's Fourteenth

---

[8] A final note on experts: Defendants contend that Plaintiff *requires* the support of an expert to survive summary judgment on a deliberate indifference of medical care claim. *See* ECF No. 66, at 1; ECF No. 60, at 7–8. And, indeed, some courts have taken this very approach. *See, e.g., Shelley v. Mapes,* 2008 WL 4377129, at *7 (W.D. Pa. Sept. 25, 2008) ("Plaintiff cannot prove his *Estelle v. Gamble* claim without expert evidence because, unless a medical 'matter . . . is so simple, and the lack of skill or want of care so obvious as to be within the range of ordinary experience and comprehension of even nonprofessional persons,' expert testimony is necessary to establish both the lapse in meeting the standard of care (in this case deliberate indifference) and the causation of injury.") (quoting *Brannan v. Lankanau Hospital,* 490 Pa. 588 (1980)); *McCabe v. Prison Health Servs.*, 117 F. Supp. 2d 443, 452 (E.D. Pa. 1997) (noting that "[i]n certain circumstances, courts do require expert testimony in deliberate indifference cases on the first element, the severity of the medical need, namely, *if* a jury would not able to decide whether a plaintiff's medical condition is 'serious' enough to implicate the Eighth Amendment."). *See also Webster v. Trimbath,* 2009 WL 837672, at *3 (W.D. Pa. Mar. 27, 2009) ("The severity or urgency of a serious medical need affects the assessment of the deliberate indifference element of plaintiff's claim. Plaintiff's dissatisfaction with defendants' treatment does not create a genuine dispute of fact because plaintiff is not a medical expert qualified to assess defendants' actions."); *Kimbugwe v. United States*, 2014 WL 6667959, at *7 (D.N.J. Nov. 24, 2014) (granting *pro se* plaintiff's motion for appointment of counsel in a deliberate indifference of prison medical care case, in part, because of "the likelihood that Plaintiff will need an expert witness"). Though the deliberate indifference inquiry is steeped in questions ripe for expert treatment (such as the severity of a given medical condition), it is not necessary to lay down a blanket rule that expert testimony is *required* to survive a summary judgment motion in such a case. *See McCabe*, 117 F. Supp. 2d at 452 (outlining an argument for why "there is no general requirement in the Third Circuit that a plaintiff present expert testimony in Eighth Amendment deliberate indifference cases"). As is shown below, it is not the absence of *experts* that is fatal to Plaintiff's claims here; it is, instead, the absence of *any type* of record evidence from which the Court can conclude that a jury could draw a reasonable inference in Plaintiff's favor, making that a trial necessary to resolve genuine issues of material fact.

Amendment[9] rights by failing to provide medical treatment with deliberate indifference to Mr. Thomas's medical needs. Specifically, Plaintiff alleges that Defendants failed to provide treatment for Mr. Thomas's alleged drug withdrawal and depression.[10] Deliberate indifference is analyzed under a two prong test drawn from *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'" *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

A medical need is "serious," in satisfaction of the first prong of the deliberate indifference test, if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Atkinson v. Taylor*, 316 F.3d 257, 272–73 (3d Cir. 2003). A medical need is also

---

[9] "Because [Mr. Thomas] was a pretrial detainee, we analyze his § 1983 claims under the Fourteenth Amendment's substantive due process protection against arbitrary abuse of government power, his Eighth Amendment protection from cruel and unusual punishment having not yet attached." *Vargo ex rel. Vargo v. Plum Borough*, 376 F. App'x 212, 215 (3d Cir. 2010) (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988)). Such an inquiry examines whether the denial of medical care was "imposed for the purpose of punishment or whether it [was] but an incident of some other legitimate governmental purpose." *Bell v. Wolfish*, 441 U.S. 520, 538, (1979). The Supreme Court has instructed that "the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' without deciding whether the Fourteenth Amendment provides greater protections." *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Since Plaintiff does "not argue that the Fourteenth Amendment provides greater protection than the Eighth Amendment in the context of pretrial detainees, and instead contend[s] that the individual defendants were deliberately indifferent to [Mr. Thomas's] serious medical needs" we will "evaluate plaintiffs' Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment." *King v. Cty. of Gloucester*, 302 F. App'x 92, 97 (3d Cir. 2008). *See also Natale,* 318 F.3d at 581 n.5 (doing the same); *Groman v. Twp. of Manalapan,* 47 F.3d 628, 636–37 (3d Cir. 1995) (doing the same); *Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 149 (3d Cir. 2013) ("Deprivation of medical care to arrestees violates their Fourteenth Amendment right to due process if it constitutes deliberate indifference to medical needs.").

[10] Plaintiff also appears to argue that Defendants were deliberately indifferent because they failed to recognize Mr. Thomas's suicide risk. Constitutional violations for failure to provide adequate suicide precautions are analyzed under a different framework than constitutional violations for failure to provide medical care. The suicide related arguments are addressed below.

serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," *Estelle*, 429 U.S. at 103, or a "life-long handicap or permanent loss," *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987).

Mr. Thomas's depression was diagnosed by a physician in 2012 and he was prescribed Zoloft for treatment. *See* ECF 78-2, at 2–3. Generally, this is a serious medical need. *See Smith v. Carver,* 2008 WL 436911, at *4 (E.D. Pa. Feb. 15, 2008). Mr. Thomas's alleged drug withdrawal is a different and closer question. Prison inmate Bittner indicated that Mr. Thomas repeatedly asked the nurses and CO's for medication for his "dope sickness" (withdrawal), and, in Bittner's opinion, Thomas had the "telltale signs" of drug withdrawal. *See* ECF No. 78-18, at 7–10 (Inmate Bittner: "It is just that kind of attitude and telltale signs about it, you can tell who was a user and who wasn't using."). Likewise, inmate Davanzo heard Mr. Thomas's continuous requests for medication and concluded that Mr. Thomas must therefore require treatment. *See* ECF No. 78-19, at 8 (Inmate Davanzo: "He wanted them, which in my opinion says, I need them.").

However, Davanzo also noted that these kinds of requests were a common occurrence at the Prison: "[t]here would always be multiple inmates [saying] I want to see the nurse. I want to see the nurse." *See* ECF No. 78-19, at 13. Indeed, the record does not contain any indication that Prison officials noticed or recognized Mr. Thomas exhibiting drug withdrawal symptoms. *See* ECF No. 78-17, at 10; ECF No. 73-2, at 6; ECF No. 73-6, at 8. According to Dr. Guzzardi, the only individuals who indicated that Mr. Thomas was experiencing withdrawal symptoms— fellow inmates Charles Bittner and Joseph Davanzo—described signs of drug withdrawal that "were minimal and predominately subjective." ECF No. 73-6, at 10.

It is, therefore, unclear whether Mr. Thomas was actually suffering from a "sufficiently serious" medical condition—that is, a condition "diagnosed by a physician as requiring treatment," a condition "so obvious that a lay person would easily recognize the necessity for a doctor's attention," or a condition leading to the "unnecessary and wanton infliction of pain" without treatment. *Atkinson*, 316 F.3d at 272–73; *Lanzaro*, 834 F.2d at 347. Nonetheless, the Court need not definitively determine whether or not Mr. Thomas's alleged drug withdrawal was "sufficiently serious" to warrant Fourteenth Amendment consideration because, no matter the answer to that question, the record does not support an inference that any Defendant was deliberately indifferent to an alleged serious medical need.[11] *See Navolio v. Lawrence Cty.*, 406 F. App'x 619, 622 (3d Cir. 2011) (assuming that chemical withdrawal experienced during detention was a serious medical need, but concluding that defendants did not act with deliberate indifference to the plaintiff's medical need); *Potter v. Fraser*, 2011 WL 2446642, at *5 (D.N.J. June 13, 2011) ("Assuming that drug withdrawal and Hepatitis C are serious medical needs, as written, the Complaint fails to state a § 1983 medical care claim because the facts alleged in the Complaint do not show deliberate indifference.").

---

[11] Plaintiff's citation to *U. S. ex rel. Walker v. Fayette Cty., Pa.*, 599 F.2d 573 (3d Cir. 1979) does not provide definitive guidance on the question of serious medical need here. *Walker* was decided at the motion to dismiss stage, and as such, the court there (rightly) accepted as true allegations that the plaintiff endured ten days of "stomach cramps, chills, sweating, lack of sleep, dry heaves, and much pain and suffering," due to drug withdrawal. *Id.* at 574. At the summary judgment stage, the Court must "resolve all factual disputes against the moving party," *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir. 1980), but should not disregard the moving party's uncontested facts. The Court accepts that Mr. Thomas frequently requested withdrawal medication and that fellow inmates subjectively believed that Mr. Thomas was suffering from dope-sickness, but as noted below that does not resolve the issue.

Plaintiff's citation to *Johnson v. Medlock*, 2011 WL 311359, at *4 (W.D. Pa. Jan. 28, 2011) is not determinative either—indeed the case is hardly applicable. Plaintiff suggests that the case holds "in part, that nurses and guards were indifferent by not providing drug withdrawal medical assistance," ECF No. 76, at 29, but this is not the holding of that case. Yes, the plaintiff in that case did, once, tell guards that he thought he was going through drug withdrawal, but the plaintiff actually died of peritonitis—an infection of the abdominal wall caused, in *Medlock*, by a perforation and necrosis of the small intestine. This is surely a serious medical condition. Denial of summary judgment in *Johnson* was premised, in part, on the opinion of plaintiff's medical expert that death by peritonitis is terribly slow and painful. As such, there was a contested issue of material fact as to whether the prison officials heard the plaintiff's agony and recognized that the plaintiff was suffering from a painful medical condition.

To be "deliberately indifferent" to a plaintiff's serious medical need, the plaintiff "must make a subjective showing that defendant acted with a sufficiently culpable state of mind." *Pinchak*, 294 F.3d at 499. The level of culpability required for a deliberate indifference claim lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Thomas v. Dragovich*, 142 F. App'x. 33, 36 (3d Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). *See also Innis v. Wilson*, 334 F. App'x 454, 456 (3d Cir. 2009) ("Deliberate indifference requires that prison officials know of an excessive risk to an inmate's health or safety and affirmatively disregard that risk." (citing *Farmer*, 511 U.S. at 835–38)). For example, deliberate indifference will be found where the official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Because a culpable state of mind is required to find deliberate indifference,"[m]ere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108–09 (3d Cir. 1990). *See also United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). In order to establish a sufficient case of deliberate indifference, prisoners must plead "some more culpable state of mind" than "negligence or medical malpractice," such as an "unnecessary and wanton infliction of pain." *Rouse*, 182 F.3d at 197. Further, "disagreement as to the proper medical treatment is also insufficient" to state a claim for deliberate indifference. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). Thus, "as long as a physician exercises professional judgment his behavior will

not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

The record demonstrates that Plaintiff cannot show that any Defendant was deliberately indifferent to Mr. Thomas's depression needs, because there is no allegation that Mr. Thomas requested depression medication or that any Prison official knew or was on notice that Mr. Thomas required, but was not receiving, any form of depression medication. During Mr. Thomas's medical intake process, he denied being on any psychotropic medication, ECF No. 78-16, at 37, and there is no record evidence that Mr. Thomas requested or should have been receiving any form of depression-related medication.

With respect to the denial of medication for alleged cocaine withdrawal (assumed, for these purposes, to be a sufficiently serious medical condition), Plaintiff argues that Nurse DeLorenzo should have recognized that Mr. Thomas was suffering from drug withdrawal because of his consistent requests for medication and the statements of fellow inmates. Plaintiff further argues that DeLorenzo subjectively disregarded this known medical condition because Mr. Thomas was allegedly previously involved in an altercation with other members of the medical staff. Nurse DeLorenzo testified that she knew nothing about an altercation between Mr. Thomas and medical staff and that Mr. Thomas had not been rude to her, but that the other nurses had told her that Mr. Thomas had been rude and belligerent around the other medical staff. *See* ECF 78-16, at 28–29, 38–39.

Regardless of whether there was or was not such an "altercation," however, the record would not support a conclusion that Nurse DeLorenzo acted with deliberate indifference toward a serious medical need of Mr. Thomas. Nurse DeLorenzo was asked to see Mr. Thomas because he told the guards that he was going through withdrawal. When DeLorenzo met with Mr.

Thomas, she questioned him and took urine drug screens for both heroin and oxycodone—both came up negative (indicating that such drugs were not in Mr. Thomas's system). *See* ECF No. 78-16, at 38–39. Since Nurse DeLorenzo investigated possible heroin withdrawal but found no evidence of the condition, it cannot be said that she was deliberately indifferent to a known condition of heroin withdrawal. While DeLorenzo "could conceivably be wrong, [s]he cannot consciously disregard a risk [s]he has found reason to believe does not exist." *Bearam v. Wigen*, 542 F. App'x 91, 92 (3d Cir. 2013) (holding that a medical professional was not deliberately indifferent where the prisoner alleged that the professional "performed some investigation and determined that [the prisoner] does not have the condition he thinks he has.").

However, after DeLorenzo informed Mr. Thomas that both the heroin and oxycodone screens were negative, Mr. Thomas said that he had been using cocaine as well. ECF No. 78-16, at 39. As DeLorenzo informed Mr. Thomas, the Prison did not provide detoxification medication for cocaine because there is no medical protocol for such, and Plaintiff has not pointed to the existence of any. *Id. See also* ECF 78-16 at 19–20 (DeLorenzo: "We don't test for cocaine. We used to, but we don't anymore, because there is not a detox protocol for cocaine."). This is a medical judgment on behalf of the Prison; it may be an *incorrect* or *negligent* medical judgment, but that alone does not give rise to deliberate indifference.[12] *See*

---

[12] There *may* be some cases where an "incorrect" medical judgment is so patently absurd that it calls into doubt whether or not the decision was actually based on "medical" rationale (even incorrect medical rationale), but this is not such a case. Dr. Guzzardi opined that in his judgment:

> Cocaine withdrawal does not require specific medical intervention. There is no generally recognized specific detoxification protocol for cocaine. As with withdrawal from any long term addiction, supportive care is useful in ameliorating discomfort. I have detoxified many patients who were addicted to cocaine without medication. And without problems.

ECF No. 73-6, at 9. Applying the *Donovan* standard, Dr. Guzzardi is advancing a "fact"—that there is no generally recognized specific detoxification protocol for cocaine. Indeed, even according to one of Mr. Thomas's fellow inmates, "you don't withdraw from cocaine and you are not going to be sick from two bags of dope." *See* ECF No. 78-19. Thus, there is an unrebutted plausible medical basis for the judgment to not provide treatment for cocaine

*White*, 897 F.2d at 108–09 ("Mere medical malpractice cannot give rise to a violation of the Eighth Amendment."); *Rouse*, 182 F.3d at 197 ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference."). Nurse DeLorenzo did not refuse to provide required medical treatment without reason or prevent Mr. Thomas from receiving recommended medical treatment; instead she concluded—consistent with Prison medical policy—that no medical treatment was necessary or even available. This is not deliberate indifference. *See Goodrich v. Clinton Cty. Prison,* 214 F. App'x 105, 112 (3d Cir. 2007) (holding that a medical professional "clearly indicate[d] an exercise of medical judgment rather than deliberate indifference" where the medical professional "engaged in a good-faith clinical assessment of [plaintiff's] symptoms, concluding on several visits that his condition did not warrant medication"); *Chimenti v. Kimber*, 133 F. App'x 833, 836 (3d Cir. 2005) ("[A]llegations that Dr. Mohadjerin took [plaintiff] off of [medication] do not state a claim of deliberate indifference because there is nothing to suggest that this was not an exercise of medical judgment."). *See also Cobbs v. Caputo*, 578 F. App'x 84, 85 (3d Cir. 2014) (quoting *Estelle*, 429 U.S. at 107 for the proposition that "[a] medical decision not to order an X-ray . . . does not represent cruel and unusual punishment. At most it is medical malpractice."); *Ruff v. Health Care Adm'r*, 441 F. App'x 843, 846 (3d Cir. 2011) ("Although it is unfortunate that Ruff's fractured rib went undisclosed for two years, [defendant's] medical choice to not order an x-ray . . . at most exhibits negligence, which is insufficient to state a cognizable Eighth Amendment claim."); *Potter v. Deputy Attorneys Under Abraham*, 304 F. App'x 24, 27 (3d Cir. 2008) (Prisoner's claims that the prison doctor declined to authorize additional medical tests "was, at best, a claim of negligence.").

---

withdrawal and the Court cannot say that the Prison's decision was so facially incongruous that it could call into question whether or not the judgment was really *medical* in nature.

Of note, the Court is not favoring one side's evidence (cocaine withdrawal was not to be treated with medication) over the other's (medication was not provided because of Mr. Thomas's prior belligerence toward uninvolved Prison staff members). Instead, it is a case of two things being true at the same time. It may well be true (and, indeed, for purposes of summary judgment the court assumes that it *is* true) that there was a heated emotional exchange between Mr. Thomas and some other Prison medical officials. However, since it is uncontested in the record, the Court also accepts as true that Prison officials had a uniform policy of not following a medical protocol to treat cocaine withdrawal, given the uncontradicted record that there is no such generally recognized or recommended protocol. The Court is not resolving a factual dispute in favor of one party, but rather accepting both sets of facts to be true and applying settled law in light of these uncontested facts.

For the same reasons, a deliberate indifference claim cannot be asserted against Officer Tammy Popiesh, either. Plaintiff asserts that "Popiesh was deliberately indifferent, along with the other guards on duty, based upon a jail climate of 'do-nothingness' regarding Thomas." ECF No. 76, at 55. However, in the Third Circuit, non-medical prison personnel are entitled to rely on the advice and opinions of medical personnel with respect to a prisoner's treatment and care. *See Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004). Non-medical personnel may be held liable only if they have a reason to believe that the medical personnel are mistreating or not treating a prisoner. *Id.* Here, there is nothing in the record to suggest that Popiesh (or any other non-medical personnel, for that matter) had reason to believe that the Prison medical personnel were mistreating Mr. Thomas by declining to provide him with cocaine withdrawal medication in accordance with Prison medical policy.

### III. RECKLESS INDIFFERENCE TO A PARTICULAR RISK OF SUICIDE

Next, Defendants argue that Plaintiff's suicide-risk claim also fails as a matter of law. The heart of Plaintiff's claim in this regard is that Defendants violated Mr. Thomas's constitutional rights by failing to provide adequate suicide prevention measures, and in particular, failing to place him on suicide watch. And indeed, such claims are well established in Third Circuit law. Liability for prisoner suicides developed out of the deliberate indifference standard when cases recognized that a "particular vulnerability to suicide" could represent a "serious medical need." *See Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) (*Colburn I*). From this, prison suicide cases developed a discrete body of case-law defining the contours of the right and the action: "a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a particular vulnerability to suicide, (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers acted with reckless indifference to the detainee's particular vulnerability." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (*Colburn II*) (internal quotations omitted).

Under the first prong, the plaintiff must show that there was a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." [13] *Id.* at 1024. Plaintiff alleges that Mr. Thomas had a particular vulnerability to suicide because he had a history of mental illness, depression, and a prior suicide attempt, used a substantial quantity of drugs prior to being

---

[13] It would seem that any individual who *does* commit suicide has a particular vulnerability to suicide—after all, they are among the subset of individuals who *do* commit suicide. Thus, the test must mean that this individual displayed or possessed certain indicators such that, *ex ante*, a hypothetical expert observer with the necessary information about the individual—but current understandings of suicide tendencies—would have concluded that there was a strong likelihood that *this* individual would commit suicide. Notice how this is different from the second prong of the test—that an *actual* observer with *actual* information of the individual knew or should have known of this particular vulnerability.

detained, exhibited mood swings and was belligerent with the Prison staff, and was suffering from drug withdrawal symptoms.[14] *See* ECF 76, at 49–51. However, Plaintiff does not present any expert testimony or parallel case-law[15] from which the Court could conclude that these factors establish that there was a "strong likelihood, rather than a mere possibility" that Mr. Thomas would commit suicide. *See Colburn II*, 946 F.2d at 1024. Plaintiff's only proffered support is a reference to two medical textbooks, which—according to Plaintiff—say that "cocaine withdrawal symptoms typically include . . . suicide." ECF No. 76, at 35 n.12.[16] Plaintiff did not produce any experts that referenced these textbooks, nor did Plaintiff provide copies of the referenced chapters, but the Court tracked them down. Neither textbook makes a reference to suicide being a symptom of cocaine withdrawal. *See* Alan B. Wolfson, *et al.*, CLINICAL PRACTICE OF EMERGENCY MEDICINE, ch. 337, 1545 (Wolters Kluwer, 5th ed., 2010) (noting only that "[w]ithdrawl from cocaine may result in lethargy, dysphoria, and depression"); Judith E. Tintinalli, *et al.*, EMERGENCY MEDICINE A COMPREHENSIVE STUDY GUIDE, Ch. 168, 1078 (McGraw-Hill, 6th ed., 2004) ("Cocaine withdrawal is characterized by irritability, paranoid

---

[14] Plaintiff also asserts that Mr. Thomas possessed a particular vulnerability to suicide because "no full assessment of Thomas's mental status occurred at any time he was in custody" and because the intake officials did not examine Mr. Thomas's prior incarceration records (which contained a medical intake form from a prior 2009 incarceration in which Mr. Thomas self-reported a suicide attempt around June, 2008—17 months before that prior incarceration). *See* ECF No. 76, at 50; ECF No. 78-5, at 8. While these points may be relevant to municipal liability or the second prong of the *Colburn* test (whether the individuals knew or should have known of the vulnerability) they provide no insight into whether Mr. Thomas actually possessed characteristics that would lead a hypothetical observer to conclude that Mr. Thomas had a particular susceptibility to suicide.

[15] *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003), cited in Plaintiff's "vulnerability to suicide" section is not a suicide case. *See* ECF No. 76, at 50.

[16] Plaintiff also contends that "cocaine withdrawal symptoms typically include . . . suicidal thoughts" at ECF No. 76, at 65; however, Plaintiff cites no authority for that claim.

ideation, and delayed depression. Symptoms are generally milder than for amphetamines. Psychological addiction may be particularly strong").[17]

Contrary to Plaintiff's assertions, Dr. Althouse opined that Mr. Thomas was not a significant suicide risk:

> Moreover, even if Nurse DeLorenzo and/or Shift Commander Barnes had had access to Mr. Thomas' historical correctional, medical, and mental health records at receptions, a brief overview of that information would have been little help in their decision-making because there is a distinct difference between having a history of suicide risk correlates and having an inclination to commit suicide. Despite Mr. Thomas's numerous historical conditions [that] the suicide literature has correlated to a greater or lesser degree with inmates who have attempted or committed suicide, many inmates with similar histories do not commit suicide, and there were few, if any, subjective indicators that Mr. Thomas was inclined to do so.

ECF 73-2, at 7. Though Plaintiff (unsuccessfully) hoped to exclude Dr. Althouse's report, Plaintiff did not test the opinions in this report through deposition examination or a contrasting expert report. Further, even if this is considered to be pure opinion and thus, under a broad reading of *Donovan*, unusable in support of summary judgment motions, Plaintiff has nonetheless failed to provide an evidentiary basis from which a jury could conclude that Mr. Thomas possessed a "particular vulnerability" to suicide while he was held at Fayette County Prison as defined by Circuit precedent.

Notably, other cases in our Circuit have held that even evidence of actual suicide correlates (that is, characteristics that correlate with higher rates of suicide) does not establish a particular vulnerability for suicide. In *Wargo v. Schuylkill Cty.,* 2008 WL 4922471 (M.D. Pa. Nov. 14, 2008), *aff'd*, 348 F. App'x 756 (3d Cir. 2009), the plaintiff presented an expert report

---

[17] Of note, the text does say that amphetamine withdrawal carries a "considerable potential for long term depression and suicide." Though cocaine and amphetamine appear to have similar pharmacology, *See* R. Bruce Holman, *Biological Effects of Central Nervous System Stimulants*, 89 ADDICTION 1435, 1435–36 (1994); *The Neuropharmacology of Drugs and Abuse*, in U.S. Congress, Office of Technology Assessment, BIOLOGICAL COMPONENTS OF SUBSTANCE ABUSE AND ADDICTION (U.S. Government Printing Office 1993), there is no record evidence that the textbook's statement about the potential for suicide during amphetamine withdraw also applies to cocaine. Plaintiff has not argued this point, either.

indicating that people exhibiting the plaintiff's characteristics—"youth, the severity of the crime he had committed and his awareness of it, his addiction to Oxycontin and his likely withdrawal from the drug"—are more likely to commit suicide than other inmates. *Id.* at *6. However, this evidence was not enough to get past summary judgment because the "vulnerability to suicide" examination "requires that the evidence establish that the particular individual, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide." *Id.* ("Plaintiff has produced no evidence that [the plaintiff] himself represented the suicide risk that would create liability for the prison, and the court cannot ascribe to him a particular vulnerability based on broad social and demographic characteristics."). Likewise, in *Joines v. Twp. of Ridley*, 229 F. App'x 161, 163 (3d Cir. 2007), the plaintiff offered expert testimony that he was "young, intoxicated, and acting irrationally in his cell," and that "these factors point toward a heightened risk of suicide." *Id.* at 163. However, even this evidence did not show that there was a "strong likelihood of self-inflicted harm" or that plaintiff, himself, "was inclined toward self-inflicted harm." *Id.* ("Therefore, Plaintiff has not established the first element, so the claim fails."). *See also Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005) (finding no genuine issue of material fact as to whether a pre-trial detainee had a particular vulnerability to suicide, despite the detainee's intoxication, fluctuating mood, and reported distress about his family situation); *Barker-Puza v. Carbon Cty.*, 304 F. App'x 47, 49 (3d Cir. 2008) ("[Plaintiff's] erratic mood swings, his intoxication, and the circumstances that resulted in his arrest. . .—while prophetic in hindsight—suggest only the 'mere possibility' that [plaintiff] posed a suicide risk."). The record here does not contain evidence that Mr. Thomas's particular mental illness history, drug use, prison behavior, or alleged cocaine withdrawal correlate with

increased suicide rates—much less any evidence that Mr. Thomas, himself, was particularly vulnerable to suicide.[18]

Furthermore, Plaintiff has failed to show that any individual Prison official "knew or should have known" about Mr. Thomas's (alleged) particular vulnerability to suicide, or that the officers "acted with reckless indifference" to this knowledge. *See Colburn II*, 946 F.2d at 1023. Liability may not be imposed unless "there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Id.* at 1025. Instead, the "strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action." *Id.* ("[T]he risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."). Just as Plaintiff has produced no evidence to suggest that there was a strong likelihood that Mr. Thomas would commit suicide, there is no evidence that a lay observer who heard Mr. Thomas's screening responses and observed his restlessness would believe that suicide-preventative action was necessary. Indeed, a *professional* observer who *had* this information—Nurse DeLorenzo—concluded that no suicide precautions were necessary; there is no record basis to conclude that a lay observer would have reached a different conclusion. *See Baez v. Lancaster Cty.*, 487 F. App'x 30, 31 (3d Cir. 2012)

---

[18] And, indeed, there is a sound, pragmatic reason for the law to not quickly make such a logical jump. Were the law to impose liability upon a prison (or its officials) whenever there was *any* possibility for suicide (perhaps because of the presence of *some* recognized or presumed suicide correlates), prisons could be led to place *any* individual showing or suspected of having such suicide correlates into suicide watch, resulting in severe restrictions on a prisoner's liberty interests. This, too, would be an unsettling state of affairs. As explained by Dr. Guzzardi, suicide watch at Fayette County Prison is "not a trivial matter." ECF No. 73-6, at 10. Individuals placed on suicide watch have all personal and sharp items removed, are placed in a suicide smock, are denied blankets, sheets, socks, shoelaces, underwear, matches, and smoking material, and must specifically request toilet paper for use. *See id.*; ECF 78-14, at 5. As well, potentially suicidal inmates may also be involuntarily committed to a mental health or forensic facility. ECF 78-14, at 6. In essence, Plaintiff asks the Court to require any individuals with a history of mental illness and drug use to endure such highly restrictive conditions. *Cf. Dean v. Gloucester Cty.*, 2016 WL 818708, at *4 (D.N.J. Mar. 2, 2016) (ruling on a plaintiff's claim that being placed in suicide watch violated his constitutional rights). Circuit precedent does not require that, and for these reasons, this Court is quite hesitant to declare it.

("[T]he likelihood that [plaintiff] would harm himself was not obvious to the psychologist, let alone a layperson."). Perhaps Nurse DeLorenzo was incorrect or negligent in reaching this conclusion (as outlined above, the Court does not conclude that she was), but negligence, even if proven, would not be enough.

The record does not support a plausible inference that Brian Miller, Tammie Popiesh, Shannon DeLorenzo (or any other Prison official) violated the Constitution or federal law by failing to provide suicide-prevention measures to Mr. Thomas; that is, Plaintiff has not shown that any of these individual Defendants acted with a reckless indifference to a particular risk of suicide which was known or should have been known to that Defendant.

## IV. LIABILITY FOR PRIMECARE, FAYETTE COUNTY, AND WARDEN MILLER

Plaintiff also asserts a number of municipal liability and "failure to" allegations against PrimeCare, Fayette County, and Warden Miller.[19] As outlined above, the record would not support a finding that Mr. Thomas's suicide was caused by a constitutional violation by any individual Prison official. The record before the Court does not support an inference that any individual medical or Prison official Defendant was deliberately indifferent to Mr. Thomas's medical needs, or that any individual medical or Prison official Defendant acted with a reckless

---

[19] Plaintiff contends that liability should be imposed against these Defendants because: (1) The Prison officials were required to examine the files from prior incarcerations but did not do so, ECF No. 76, at 32; (2) Joseph Barnes, the official who performed Mr. Thomas's initial intake, was not medically trained, *id*. at 33; (3) individuals placed on "Doc 30 Watch" were not to be removed except by a psychiatrist or psychologist *id*. at 34; (4) guards were not trained to recognize the symptoms of mental illness, as required by prior Pennsylvania Department of Corrections investigations of the Prison, *id*. at 35; (5) an individual placed on "Doc 30 Watch" must stay there for 3-4 days, *id*. at 43; (6) no policy required communication between medical staff and correctional staff, *id*. at 37; (7) there was no training for correctional personnel to recognize symptoms of mental illness or cocaine withdrawal *id*. at 53; (8) Prison policy failed to require intake staff to continuously monitor and reassess detainees after intake, *id*. at 40; (9) there was no system in place to determine if an individual was under the influence of a particular drug, beyond the urine testing protocols, *id*.; and (10) there was no system in place to require particular monitoring of an inmate who was removed from a special observation protocol to ensure that symptoms would not reoccur, *id*.

indifference to a particular risk of suicide which was known or should have been known by that Defendant.

However, the Third Circuit has clarified that, in some limited cases, a municipality can be held independently liable for violating a plaintiff's constitutional rights, even if there is no individual liability. *See Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3d Cir. 1994); *Simmons v. City of Philadelphia,* 947 F.2d 1042 (3d Cir. 1991). "If it can be shown that the plaintiff suffered that injury, which amounts to deprivation of life or liberty, because [an individual official] was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights." *Fagan*, 22 F.3d at 1292.

But *Fagan*'s reach is limited. *Fagan* carved out a distinction from a prior Supreme Court case that seemed to say that a municipality cannot face liability if no individual faces liability, *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), and *Fagan* itself has been cabined on the merits. As described by the Third Circuit in a later case:

> In *Fagan,* we observed that a municipality could remain liable, even though its employees are not, where the City's action itself is independently alleged as a violation and the officer is merely the conduit for causing constitutional harm. We were concerned in *Fagan* that, where the standard for liability is whether state action "shocks the conscience," a city could escape liability for deliberately malicious conduct by carrying out its misdeeds through officers who do not recognize that their orders are unconstitutional and whose actions therefore do not shock the conscience. Here, however, like *Heller* and unlike *Fagan,* the question is whether the City is liable for causing its officers to commit constitutional violations, albeit no one contends that the City directly ordered the constitutional violations. Therefore, once the jury found that [the officers] did not cause any constitutional harm, it no longer makes sense to ask whether the City caused them to do it. Additionally, recognizing that *Heller* had addressed a closely related issue, we carefully confined *Fagan* to its facts: a substantive due process claim resulting from a police pursuit. By contrast, both this case and *Heller* involve primarily a Fourth Amendment excessive force claim.

*Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) (internal citations

omitted). *See also*, *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 (3d Cir. 1995) ("[T]he

*Fagan* panel opinion appeared to hold that a plaintiff can establish a constitutional violation

predicate to a claim of municipal liability simply by demonstrating that the policymakers, acting

with deliberate indifference, enacted an inadequate policy that caused an injury. It appears that,

by focusing almost exclusively on the 'deliberate indifference' prong of the *Collins* test, the

panel opinion did not apply the first prong—establishing an underlying constitutional

violation."). Indeed, some courts have actively cabined *Fagan* to its facts and held that,

generally, plaintiffs may not pursue a municipal liability claim without any concomitant

individual liability. *See, e.g.*, *DeNinno v. Municipality of Penn Hills*, 269 F. App'x 153, 158 (3d

Cir. 2008) ("Even more fundamentally, there can be no municipal liability here because we have

determined that none of the individual defendants violated the Constitution.") (citing *Grazier*,

328 F.3d at 124 n.5); *Cole ex rel. Cole v. Big Beaver Falls Area Sch. Dist.*, 2009 WL 3807185, at

*8 (W.D. Pa. Nov. 12, 2009) (holding that "Plaintiff's reliance on *Fagan* is misplaced" because

*Fagan* merely carved out an exception to "the general rule of law that a municipality cannot be

held accountable pursuant to § 1983 when no individual officer violated the Constitution"—

"[s]ubsequent to *Fagan,* the United States Court of Appeals for the Third Circuit has clearly

stated that it 'carefully confined *Fagan* to its facts: a substantive due process claim resulting

from a police pursuit.'") (citing *Grazier*, 328 F.3d at 124 n.5); *Leddy v. Twp. of Lower Merion*,

114 F. Supp. 2d 372, 377 (E.D. Pa. 2000) (holding that "if the actions of [the officer] did not

reach the level of a constitutional tort, the Township through its police department cannot be

liable because of an inadequate policy or ineffective training program" and noting *Mark*'s

criticism of *Fagan*). *See also Willard v. Pennsylvania Soc. for the Prevention of Cruelty to*

1

*Animals*, 2012 WL 1392657, at *6 (E.D. Pa. Apr. 23, 2012) *aff'd,* 525 F. App'x 217 (3d Cir. 2013) ("[A] municipality cannot be liable for the failure to supervise or train an officer when there is no underlying constitutional violation by the officer."); *Thomas v. City of Philadelphia*, 804 A.2d 97, 111 (Pa. Comm. Ct. 2002) (noting that *Fagan* "has not stood the test of time even in the Third Circuit.").[20]

This case does not involve "a substantive due process claim resulting from a police pursuit" so *Fagan*'s independent municipal liability holding is not directly applicable. *See Grazier*, 328 F.3d at 124 n.5. On the other hand, the allegations here sound in Fourteenth Amendment violations (like *Fagan*), rather than Fourth Amendment violations (as did the claims in *Heller* and *Grazier*). To this Court, the *Fagan* conundrum appears to be a debate about the causation analysis for § 1983 claims. As discussed in further detail below, a successful claim against a municipality must show that the policy or custom (or failure to train or supervise) actually *caused* the constitutional violation at issue. With the causation analysis in mind, the range of realistic situations in which a municipal policy or custom can *cause* a plaintiff's constitutional violation without any official being personally liable is limited significantly. *Fagan*, however, contemplates the hypothetical outlier. At its heart, *Fagan* was concerned with those situations in which "municipal policymakers, acting with deliberate indifference or even malice, implemented a policy which *dictated* [the individual official's] injury causing actions" even though the officers themselves remain "ignorant of the danger created" by their actions— and thus free from liability under § 1983's strict mental state requirements.[21] *Fagan*, 22 F.3d at

---

[20] It also seems that the majority of the Circuits disagree with *Fagan* and have adopted the overarching rule that a municipality cannot be liable unless there is a constitutional violation by the municipal actor causing the plaintiff's harm. *See Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154–56 (10th Cir. 2001) (collecting cases and noting *Fagan* as the outlier).

[21] Of course, it is a not uncommon feature of our system of imposing constitutional liability (or not) that a constitutional right may be violated without any redress or legal remedy. An individual may violate a plaintiff's

1292 (emphasis added).[22]  Note how *Fagan* envisioned a situation in which the policy *dictated* the injury causing action, [23] as distinct from a situation in which the municipal policy merely *allowed* the individual officer to violate a plaintiff's constitutional rights.  In the former case, one could say that the municipal policy "caused" the injury; in the latter, a causal link is much more tenuous.

As such, this Court believes that the key to untangling *Fagan* is to analyze whether, in this case, any alleged municipal policy or custom could be found to have "caused" the alleged constitutional deprivation.  As should be clear by now, simply pointing out the existence of an allegedly unlawful policy or custom is not enough to maintain such a § 1983 claim.  "A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir. 1984)).  "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Id.  See also Estate of Bailey by Oare v. Cty. of York*, 768 F.2d 503, 507 (3d Cir. 1985) (There must be a

---

constitutional right, but *liability* often depends upon meeting a "fault" requirement or getting past various "immunity" doctrines. In academic parlance, this is referred to as the "Right-Remedy Gap."  *See* John C. Jeffries, Jr., *The Right-Remedy Gap in Constitutional Law*, 109 Yale L.J. 87  (2000).

[22] Put differently, this is a concern over a possible information asymmetry between municipalities and officers. *Fagan* contemplates a situation where the municipality has sufficient information to conclude that the action required under the policy would constitute a constitutional violation (thus meeting the mental state requirement), but the individual officials do not have sufficient information to make such a conclusion (thus failing the mental state requirement).  *See Fagan*, 22 F.3d at 1292 ("It is easy to imagine a situation where an improperly trained police officer may be ignorant of the danger created by his actions and inflicts injury. Meanwhile, the city's policymakers, with a wealth of information available to them, are fully aware of those dangers but deliberately refuse to require proper training.").

[23] Consider a stylized example:  Municipality, with malice towards those who drive red convertibles and with the intent to discriminate against those who drive red convertibles, establishes a policy in which every police officer must stop all drivers of red convertibles.  Assume this action violates the constitutional rights of these drivers, but is not so obviously unlawful that a police officer would know that.  An officer, acting without malice or intent to discriminate but merely following municipal policy, takes this action and violates the constitutional rights of a plaintiff.  In that case, the officer may escape personal liability, but—under the *Fagan* analysis—the municipality will still have "caused" the constitutional violation.

"plausible nexus between the policy . . . and the infringement of constitutional rights."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985) ("[T]here must be an affirmative link between the policy and the particular constitutional violation alleged.").

Notably, this "causation" requirement also applies to the claims against PrimeCare and the failure to train/supervise claims. As a state contractor, for PrimeCare to be liable under *Monell*, Plaintiff "must provide evidence that there was a relevant [PrimeCare] policy or custom, and that the policy *caused* the constitutional violation they allege." *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003) (emphasis added). Likewise, a "failure to train" claim requires a showing that the "inadequate training policies were the 'moving force' behind their injuries. This is at base a causation requirement." *Grazier*, 328 F.3d at 125. Ditto for a failure to supervise. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (requiring, for supervisory liability, that "the underlying's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.")

In making their motion, Defendants have adequately demonstrated that there is not a factual basis from which a jury could conclude that any of the allegations underlying the municipal liability or "failure to" claims actually *caused* Mr. Thomas's alleged constitutional harm—allowing him to commit suicide. *See Celotex*, 477 U.S. at 322–24 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). In doing so, Defendants fulfilled their initial summary judgment burden; Plaintiff has not responded with specific record facts to plausibly show that a jury could rationally conclude that the alleged policy failures *caused* Mr. Thomas's injuries. For example, Plaintiff alleges that the Prison guards and intake officials were inadequately trained to recognize the symptoms of mental

illness.  *See* ECF No. 76, at 32.  Even assuming that this were true, Plaintiff has not identified the basis from which a jury could plausibly infer that this lack of training caused the harm—or, put differently, that proper training would have alleviated or prevented the harm here, and what that training was.  The medical staff—and specifically Nurse DeLorenzo who conducted Plaintiff's medical screening—were trained to recognize the symptoms of mental illness and concluded that Mr. Thomas did not need to be on any form of suicide watch.  There is no evidence presented from which a jury could infer that more or different medical training of intake officials or Prison guards would have trumped the decisions of the Prison's medical professionals and resulted in Mr. Thomas being placed on suicide watch, notwithstanding the contrary conclusions of the medical professionals.

Similarly, Plaintiff alleges that the Prison officials failed to follow the written PrimeCare policy which prescribed that an inmate who *had* been placed on suicide watch could only be removed from the watch with the authorization of the Psychiatrist/Psychologist.  *See* ECF No. 76, at 34.  Presumably, Plaintiff classifies the initial monitoring scheme ordered by Mr. Barnes at Mr. Thomas's original intake to be a "suicide watch," but the factual record simply does not support this point.  *See* ECF No. 78-9 (showing the result of Officer Barnes's Suicide Screening Questionnaire as "NO SUICIDE WATCH").   But even if we assume it to be true for these purposes, Plaintiff introduces no specific record facts from which a jury could infer that if a psychiatrist or psychologist *had* examined Mr. Thomas, this would have prevented his suicide.  Indeed, the only evidence of record on this point is (1) Nurse DeLorenzo's determination that Mr. Thomas did *not* need to be on suicide watch, and (2) the Defendants' expert reports that uniformly reach the same conclusion.  A plaintiff might have overcome these causation hurdles

by presenting specific evidence to show that the alleged policy failures were a "moving force" behind Mr. Thomas's alleged constitutional harm, but Plaintiff has not done so here.[24]

Perhaps an even more daunting hurdle to Plaintiff's claims is the lack of record evidence showing that the policies or customs were enacted or undertaken with deliberate indifference to the likelihood of a constitutional violation. If the allegedly unconstitutional policy or custom does not facially violate federal law—as none of the alleged policies do—liability will only be imposed if "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). *See also Mark*, 51 F.3d at 1149 ("[A] municipal entity may be liable when its policymakers made a deliberate choice from among various alternatives to follow a particular course of action, where the policy reflected deliberate indifference to the constitutional rights of the municipality's inhabitants, and where the policy was the moving force behind a constitutional violation."). "To satisfy this standard, a plaintiff must adduce evidence that the municipality (1) had notice that similar rights violations had occurred on such a widespread basis that they were likely to occur again and (2) failed to act to address that risk despite the known or obvious consequences of inaction. Notice is generally established by a pattern of prior constitutional violations." *Peters v. Cmty. Educ. Centers, Inc.*,

_____

[24] Notably, Plaintiff's various municipal liability claims (but as noted below, not all) would also likely fail for a number of reasons beyond a failure to establish causation. For many of these claims Plaintiff has failed to show that the alleged municipal practices represent either a "policy" (which exists "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict," *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)) or "custom" (which is established "when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law, *id.*). These requirements for municipal liability would provide further rationale for the dismissal of many of Plaintiff's claims, but it is not necessary to address them here. *See Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 546 (D.N.J. 2013) ("Although it is highly doubtful here that the Plaintiffs have shown that there is a genuine dispute as to whether the Defendants have promulgated a policy or custom as understood by *Monell,* the municipal liability claims fail for the simple reason that Plaintiffs cannot show that the alleged failures to train and supervise employees were the proximate causes of any constitutional violations, or that there is any plausible nexus . . . between the municipalities' customs and the specific deprivation of constitutional rights at issue.") (quotations and alterations omitted).

2014 WL 981557, at *4 (E.D. Pa. Mar. 13, 2014) (citing *Berg*, 219 F.3d at 276; *Beck v. City of Pittsburgh,* 89 F.3d 966, 975 (3d Cir. 1996)).

Likewise, "a municipality is only liable for failing to train when that failure amounts to deliberate indifference to the constitutional rights of [individuals] with whom the [employees] come in contact." *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 324 (3d Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (alterations and quotations omitted). "Failure to adequately screen or train municipal employees can ordinarily be considered deliberately indifference only where the failure has caused a pattern of violations." *Id.* For prison suicide cases, specifically, "the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Woloszyn*, 396 F.3d at 325. And supervisory liability requires deliberate indifference on the part of the supervisor as well. *Brown v. Muhlenberg Twp.*, 269 F.3d at 216. (noting that supervisory liability requires a showing that the existing custom or practice—without the unenforced or absent procedure—"created an unreasonable risk of the ultimate injury," that "the supervisor was aware that this unreasonable risk existed," and that "the supervisor was indifferent to the risk.").

Plaintiff has not put forth record facts showing that either (1) Fayette County, PrimeCare, or Warden Miller knew that the policies or practices at the Prison would lead to constitutional harm and then implemented (or failed to implement as the case may be) the policies with deliberate indifference to that knowledge, or (2) that these policies or practices were so obviously deficient and "so likely to result in the violation of constitutional rights, that the

policymakers of the [Prison] can reasonably be said to have been deliberately indifferent." *See Brown*, 269 F.3d at 215. There is no indication that any of these Defendants had notice of previous constitutional deprivations as a result of the policies and practices in play, nor is there any factual record to support the conclusion that the policies would so obviously result in constitutional harm. The latter proposition is put forth in Plaintiff's briefs, but, as Defendants have identified, there is no factual record to support this proposition

That leaves what is to the Court the most troubling of Plaintiff's municipal liability claims against the County, PrimeCare, and Warden Miller. According to the Prison's and PrimeCare's initial processing protocols, Officer Barnes was required to retrieve and utilize an entering inmate's Prison file from any prior incarcerations. *See* ECF 78-10, at 3. Plaintiff alleges (and the record supports) that this procedure was never followed here. As noted above, this alleged failure is insufficient in itself to establish liability because it did not *cause* Mr. Thomas's alleged constitutional deprivation—there was a later medical screening in which Nurse DeLorenzo exercised her independent medical judgment and concluded that Mr. Thomas should not have been placed on any kind of suicide watch. However, Plaintiff also alleges that this subsequent medical screening was insufficient because there was a policy or custom[25] of keeping the prior incarceration medical records locked up and inaccessible on the weekends (such as when Mr. Thomas was processed). *See* ECF 78-16, at 17–20. Plaintiff contends that these medical records detail Mr. Thomas's prior self-report of a suicide attempt—five years prior, with a gun, and outside of a jail environment—and a history of mental illness, that would have (or should have) formed the basis of a decision to place Mr. Thomas on suicide watch. But there is a fundamental causation issue with this argument based on the record before the Court. As noted

---

[25] As above, the Court assumes for these purposes that the actions here *do* amount to a policy or custom necessary to establish municipal liability.

above, Dr. Althouse opined that even if Nurse DeLorenzo or Officer Barnes had access to these records, a review of that information would not have led either of these officials to conclude that Mr. Thomas should have been placed on suicide watch. *See* ECF 73-2, at 7. In other words, as posited by these Defendants, the failure to review the records (allegedly in accordance with Prison policy or custom) did not *cause* Prison officials to disregard Mr. Thomas's suicide; the officials would have reached the same conclusion that they did, even if they had reviewed the records. While this expert report cannot carry the day on summary judgment (as explained previously) it does form the basis of Defendants' initial showing that there is not a genuine issue of material fact on this point for trial. Plaintiff then had the opportunity to point to specific record facts showing that there *was* such a genuine issue, but Plaintiff has not done so. Pointing out that the medical records contained evidence of a prior suicide attempt and a history of mental illness is not enough. There is no factual or opinion evidence offered to support an inference that a medical professional internalizing these data points would then conclude that Mr. Thomas should have been placed on suicide watch at this incarceration.[26]

Perhaps more importantly (and wholly independent of Dr. Althouse's views if they are to be disregarded under *Donovan*), an examination of the Prison's "Intake Suicide Screening" scoresheet for Mr. Thomas, ECF No. 59-1, at 4, shows that even if Nurse DeLorenzo had been aware of Mr. Thomas's prior suicide attempt in April of 2008, it would have added one "point" to the suicide score, resulting in a score of 4 rather than 3, still far short of the score of 8 which would have triggered suicide watch treatment. *See* ECF No. 59-1, at 4. Further, that scoresheet shows that Mr. Thomas's history of mental illness was actually noted and scored. Finally, there is nothing in the record calling into question the Intake Screening forms' treatment in this way of

---

[26] In fact, those records reveal that when Mr. Thomas was medically interviewed in November, 2009, he denied any suicidal ideation and seemed to protest his custodial assignment at that time. *See* ECF 78-5 at 8–9, 11–12.

a five year old suicide attempt, such that its existence, in and of itself, would necessarily create an issue of fact as to causation or otherwise calls into question the validity or integrity of that screening and scoring process.[27]   In short, there is nothing in the record that would allow a conclusion that this convergence of policies (look at the records / records are locked up) caused the harm alleged, and in reality the record as presented here points in the other direction.[28]

In the same vein, there is a "deliberate indifference" problem with this claim as well. Plaintiff cannot point to record facts indicating that this practice caused a pattern of constitutional violations in the past, such that the Defendants knew of the policy failure but continued the practice with deliberate indifference to that knowledge.   There is no record support for the proposition that the practice of keeping the medical records locked on the weekend caused constitutional violations in the past so as to charge these Defendants with the obligation to change the policy.   Likewise, there is no record support for a conclusion that this policy would so obviously cause a constitutional violation that the Defendants should be deemed to have "knowledge" of a policy failure, particularly in light of the fact that the information in the records would not have changed the result of the intake scoring here.

---

[27] The Court has also reviewed the excerpts of Nurse DeLorenzo's deposition as submitted by the parties.  It does not appear that *she* was asked whether (and if so, how) the information in the sequestered prior incarceration records would have affected her "suicide watch" conclusions as to Mr. Thomas, had she been aware of them.  Further, Plaintiff has advanced no record evidence that would support an inference that it *should* have or *would* have impacted Nurse DeLorenzo's conclusions.

[28] To be clear, the Court does not conclude that Plaintiff necessarily needed to present rebuttal expert testimony on these points to proceed in this case (although that certainly might have done the trick).  For instance, Plaintiff could have instead (1) impeached or otherwise called into question the basis for, or conclusions of, Dr. Althouse's opinion; (2) elicited testimony from Nurse DeLorenzo as to how the records would have or should have affected her judgment; (3) highlighted information in a learned publication creating a genuine issue of fact, assuming its author could be called at trial; (4) demonstrated with admissible evidence that the suicide scoring sheet or process grossly undervalued the impact of the prior suicide attempt; or (5) adduced other record evidence that would allow a rational inference that access to Mr. Thomas's prior custody records would have, or should have, materially affected the suicide propensity calculus.  What cannot carry the day is an assumption, without more, that the non-access to these records would have been at least *a* cause of Mr. Thomas not being on suicide watch when he died.

Therefore, Plaintiff's inability to establish a genuine issue of fact as to either causation or deliberate indifference in these regards requires dismissal of his municipal liability, failure to train, and failure to supervise claims against Fayette County, PrimeCare, and Warden Miller.

### V.  PLAINTIFF'S STATE LAW CLAIMS

Plaintiff's remaining claims allege state law claims under the Pennsylvania Wrongful Death Act, 42 Pa. Con Stat. Ann § 8301, and Survival Act, 42 Pa. Con Stat. Ann § 8302.  *See* ECF No. 33, at 37–39.  A District Court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.A. § 1367.  However, the Third Circuit has recognized, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995)) (emphasis in original).  Here, all of Plaintiff's federal claims—that is, all of the claims over which the district court had original jurisdiction—will have been dismissed.  Considerations of judicial economy, convenience, and fairness do not provide an affirmative justification for maintaining Plaintiff's state law claims.  *Shafer v. Bd. Of Sch. Dir. Of Albert Gallatin Area S.D.*, 730 F.2d 910, 912–13 (3d Cir. 1984) (noting that "time already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction" and that "decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law").  As such, the Court will dismiss these state law claims without prejudice for

want of jurisdiction.  *See Burnsworth v. PC Lab.*, 364 F. App'x 772, 776 (3d Cir. 2010) (affirming a district court's decision to decline supplemental jurisdiction over state law claims when the federal claims had been dismissed); *Alexander v. New Jersey State Parole Bd.*, 160 F. App'x 249, 251 (3d Cir. 2005) (same).


**VI. CONCLUSION**

Mr. Thomas's medical situation and tragic suicide while detained at the Fayette County Prison do not provide a basis for constitutional liability against Nurse DeLorenzo, Officer Popiesh, Fayette County, PrimeCare Medical, Inc., or Warden Brian Miller.  There is no genuine issue of material fact warranting a trial on Plaintiff's federal claims; these claims fail as a matter of law based on the record before the Court.  Further, the Court should not invoke its supplemental jurisdiction to adjudicate Plaintiff's state law claims, and therefore declines to do so.

An appropriate Order shall issue.




s/ Mark R. Hornak
Mark R. Hornak
United States District Judge



Dated: July 8, 2016

cc: All counsel of record